IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 3:18-23 |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| ANTHONY E. GRAY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is the Motion to Suppress Evidence (ECF No. 70) filed by Defendant Anthony E. Gray.  The United States filed a Response in Opposition.  (ECF No. 75)  The Court held a suppression hearing on August 24, 2020, and the parties submitted post-hearing briefs.  (ECF Nos. 93, 98, 103)  Accordingly, the Motion is ripe for disposition.  For the following reasons, the Motion to Suppress Evidence is **DENIED**.

## I.    Background and Procedural History

This case arises from a tip by a confidential informant and a traffic stop for failing to use a turn signal, leading to a search of the vehicle in which Gray was a passenger and crack cocaine being found inside of Gray's backpack.  Gray was subsequently charged with one count of possession with the intent to distribute twenty-eight grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii).  (ECF No. 1)

On March 9, 2020, Gray filed the instant Motion to Suppress Evidence (ECF No. 70) requesting that the Court "suppress all evidence and fruits of evidence obtained following an unlawful seizure of him[self]."  (Id. at 1)  On March 30, 2020, the United States filed a

Response in Opposition to the Motion to Suppress Evidence. (ECF No. 75) The Court held a suppression hearing on August 24, 2020. (ECF No. 89) At the suppression hearing, the Government presented the testimony of Officer Bobby Andrews and a video with audio of Gray recorded after Gray was placed under arrest while he was in the back of a police vehicle. (ECF No. 90; Gov. Ex. 1) Gray did not present any witnesses but presented two photographs, one depicting the location where the alleged traffic violation occurred and the other depicting the location where the vehicle he was a passenger in was pulled over and where the search occurred. (Def. Exs. A, B) Following the suppression hearing, Gray filed a post-hearing brief (ECF No. 93), the Government filed a brief in opposition (ECF No. 98), and Gray filed a reply brief (ECF No. 103).

In his motion, Gray makes two principal arguments for why the fruits of the search should be suppressed: (1) he was subjected to an unlawful seizure when Johnstown Police Officer Bobby Andrews conducted a traffic stop of the vehicle in which he was a passenger without reasonable suspicion to believe that a traffic violation had occurred; and (2) in the alternative, his seizure was unconstitutionally prolonged beyond the time necessary to resolve the traffic violation. (*Id.* at 5–6) The Government counters that there was reasonable suspicion to believe that a traffic violation had occurred and, in any event, Officer Andrews had reasonable suspicion to conduct a *Terry* stop even without a traffic violation based upon the confidential informant's tip. (ECF No. 98) In his reply, Gray contends that there was no reasonable suspicion prior to the traffic stop that he was engaged in any criminal activity.

## II.     Findings of Fact

The Court makes the following findings of fact based on the evidence and testimony presented at the suppression hearing on August 24, 2020.[1]

### A.  Officer Bobby Andrews

1.  At the time of the incident giving rise to this case, Officer Bobby Andrews was a Patrolman with the Johnstown Police Department.[2]  (ECF No. 90 at 4:24–5:4)

2.  Prior to his employment with the Johnstown Police Department, Officer Andrews completed an associate's degree and graduated from the Municipal Police Officers Education and Training Course ("MPOETC") (i.e., the Commonwealth of Pennsylvania's Police Academy).  (*Id.* at 5:8–17)

3.  As part of MPOETC, Officer Andrews received training on the Pennsylvania Motor Vehicle Code and passed a certification exam to demonstrate his proficiency in the Pennsylvania Motor Vehicle Code and other police functions.  (*Id.* at 5:18–6:3)

4.   Officer Andrews began working as a Patrolman for the Johnstown Police Department in June 2017.  (*Id.* at 6:12–14)

5.  In addition to being a Patrolman, Officer Andrews was a member of the Cambria County Drug Task Force, the Attorney General's Drug Task Force, and the Federal Bureau of Investigation's Safe Streets Task Force.  (*Id.* at 6:6–10)

---

[1] The transcript of the suppression hearing is docketed at ECF No. 90.

[2] Since March 27, 2020, Officer Andrews has been employed by the Department of Veterans Affairs as a Federal Police Officer.  (ECF No. 90 at 4:16–22)

6.  As a Patrolman with the Johnstown Police Department, Officer Andrews conducted hundreds of traffic stops for a variety of Pennsylvania Motor Vehicle Code infractions.  (*Id.* at 7:4–8:1)

7.  Officer Andrews has participated in hundreds of motor vehicle searches.  (*Id.* at 8:2–10)

8.  Officer Andrews has participated in hundreds of investigations involving narcotics.  (*Id.* at 8:22–25)

9.  Officer Andrews has participated in numerous investigations involving the use of a confidential informant ("CI") and would interact with CIs on a daily basis.  (*Id.* at 8:17–21, 9:1–5)

**B.  Tip from a Confidential Informant**

10.  At around 6:00 p.m. on July 10, 2018, a CI called Officer Andrews directly on his cell phone and informed him that a black male named Anthony Gray would be arriving in Johnstown that day from Philadelphia by Amtrak train and that he would have "work" on him.  (*Id.* at 12:23–13:10, 13:16–18)

11.  Officer Andrews knew the CI's identity, the CI had previously provided information to Officer Andrews, and prior information provided by the CI had proven reliable and had been corroborated.  (*Id.* at 13:19–14:13)

12.  Officer Andrews, knew, based on his familiarity with this CI, that the term "work" referred to narcotics.  (*Id.* at 13:12–15)

**C. Surveillance and Purported Traffic Violation**

13. After receiving the CI's tip, Officer Andrews left the police station to conduct surveillance on the Amtrak station in Johnstown.  (*Id.* at 14:15–21)

14. Officer Andrews was in a marked police cruiser and he positioned it along the 200 block of Washington Street where he could see trains arriving and departing the station as well as see people exiting the station area.  (*Id.* at 14:22–15:15, 44:13–21)

15. The Amtrak station was several hundred feet away and across the river from where Officer Andrews was parked in his police cruiser.  (*Id.* at 43:21–25)

16. It was still light outside and, from his position, Officer Andrews could observe the general physical features of individuals leaving the train station.  (*Id.* at 15:3–15)

17. Officer Andrews was having difficulty identifying people from his vantage point, so he began to move his police cruiser closer to the Amtrak station.  (*Id.* at 44:22–45:9)

18. As Officer Andrews began to move his police cruiser closer, he observed an individual matching the description of Gray exiting the train station and getting into a Suzuki SUV shortly after a train had arrived at the station.  (*Id.* at 15:9–21, 45:3–13)

19. At that time, Officer Andrews was not one-hundred percent certain that the person matching the description of Gray was, in fact, Gray.  (*Id.* 45:10–22)

20. Officer Andrews began to follow the SUV.  (*Id.* at 15:22–23)

21. The SUV went over the bridge on Walnut Street and, as it passed through the intersection of Walnut Street and Washington Street, Officer Andrews confirmed

that the individual in the passenger seat matched the description of Gray. (*Id.* at 15:25–16:6, 45:2–6)

22. Officer Andrews followed the SUV as it proceeded on Walnut Street and when it turned left onto Main Street. (*Id.* at 16:3–14)

23. The SUV pulled into a metered, parallel parking stall before the intersection of Main Street and Market Street, near a Subway restaurant. (*Id.* at 16:14–17; Def. Ex. A)

24. Officer Andrews then passed the SUV and turned right onto Market Street. (ECF No. 90 at 16:16–18)

25. As Officer Andrews turned right onto Market Street, he was able to look through the front windshield of the SUV and positively identify Gray sitting in the passenger seat. (*Id.* at 16:17–20)

26. Officer Andrews then circled around and parked on Main Street around a block behind the SUV where he could observe it. (*Id.* at 17:9–17)

27. Officer Andrews observed a female exit the driver's seat of the SUV and go into the Subway, then exit Subway a few minutes later and get back into the driver's seat of the SUV. (*Id.* at 17:14–19)

**D. Traffic Stop and Search**

28. Officer Andrews then observed the SUV merge left onto Main Street without using a turn signal. (*Id.* at 17:21–25, 18:2–10)

29. Officer Andrews believed that a turn signal was required to merge onto Main Street from the parking stall. (*Id.* at 17:21–18:10)

30. Officer Andrews activated his lights to conduct a traffic stop of the SUV.  (*Id.* at 17:25–18:1, 18:11–13)

31. The SUV pulled into a parking stall on Main Street shortly beyond Subway.  (*Id.* at 18:17–24)

32. After the vehicle pulled over, and as Officer Andrews informed the dispatcher of the traffic stop, Gray exited the vehicle and walked toward a smoke shop.  (*Id.* at 19:5–10)

33. Officer Andrews observed that the smoke shop was "clearly closed," exited his police cruiser, and ordered Gray to get back into the SUV "numerous times."  (*Id.* at 19:11–17, 20:9–10, 53:19–23, 54:18–7)

34. Officer Andrews had his hand on his side arm when he yelled at Gray and ordered him to get back into the car.  (*Id.* at 55:2–11)

35. Gray complied and got back into the SUV.  (*Id.* at 19:11–17, 20:2–5)

36. Once Gray was back inside the SUV, Officer Andrews immediately approached the passenger side of the vehicle and advised Gray not to get out of a car during a traffic stop and told Gray multiple times that Gray was making him "nervous."  (*Id.* at 20:4–12, 59:6:–10)

37. Officer Andrews and Gray recognized each other from a previous encounter on May 15, 2018.  (*Id.* at 59:13–17)

38. Gray was "very shaky" when interacting with Officer Andrews and he explained that he got out of the vehicle because he was going to the smoke shop. (*Id.* at 20:6–12)

39. Officer Andrews requested permission from Gray to conduct a pat-down of his person, to which Gray gave permission. (*Id.* at 20:18–22)

40. Officer Andrews confirmed through the pat-down that Gray did not have a firearm or drugs on his person. (*Id.* at 20:22–23, 60:13–61:2)

41. Officer Andrews then informed Gray that he was being detained, handcuffed him, and directed him to sit on the curb. (*Id.* at 20:23–32:1, 61:3–9)

42. Officer Andrews then turned his attention to the driver of the vehicle and informed her why he had pulled her over. (*Id.* at 20:25–21:8)

43. Officer Andrews asked the driver for permission to search the vehicle and she gave permission to search the vehicle. (*Id.* at 21:9–22)

44. However, in giving consent, the driver of the vehicle specifically stated that bag on the passenger seat floor was not her bag and that it belonged to Gray. (*Id.* at 21:20–22:3)

45. Officer Andrews asked the driver to exit the vehicle and she complied. (*Id.* at 21:18–19)

46. Officer Andrews picked up the bag, asked Gray if the bag was his, and Gray confirmed that the bag belonged to him. (*Id.* at 22:4–9)

47. Officer Andrews asked Gray what was in the bag and whether he could search it. (*Id.* at 22:10–12)

48. Gray stated "go ahead, that's my snacks."  (*Id.* at 22:9–12)

49. Officer Andrews opened the bag and inside the bag he found drinks, Swedish Fish, other candy, and several bags of chips.  (*Id.* at 22:13–18)

50. One bag of chips had been previously opened and, when Officer Andrews opened the bag, he observed two large disks of suspected crack cocaine.  (*Id.* at 22:18–22)

51. Officer Andrews then informed Gray that he was under arrest and placed him in the backseat of his police cruiser.  (*Id.* at 22:22–25)

**E.  Prior Relationship Between Gray and Officer Andrews**

52. On May 15, 2018, Officer Andrews was dispatched to the area near Solomon Homes in Johnstown to follow up on a call placed to 911.  (*Id.* at 9:19–22, 34:5–9)

53. The person who had called 911 told the dispatcher that he had been chased by a "light-skinned black male with a firearm" wearing a white T-shirt  (*Id.* at 9:20–22, 34:14–17)

54. Officer Andrews arrived outside of Caps Bar near Solomon Homes and observed a light-skinned black male, later identified as Gray, talking on the phone, and apparently looking for something on the ground.  (*Id.* at 10:2–8, 35:7–14)

55.  Officer Andrews stopped Gray and searched him.  (*Id.* at 110:17–19, 35:15–18)

56. Officer Andrews recovered a handgun, approximately $500 in cash (mostly in $20 bills), and a cellular phone. (*Id.* at 10:20–21, 11:25–12:5)

57. Officer Andrews found a baggie corner of suspected crack cocaine on the sidewalk in the area.  (*Id.* at 10:22–10:25)

58.  Officer Andrews interviewed the alleged victim, who stated that he and Gray got into an altercation after he refused to pay Gray for heroin that he had purchased from Gray because the alleged victim did not like the heroin and, thereafter, the alleged victim punched Gray in the face and ran away.[3]  (*Id.* at 11:4–9, 37:4–12)

59. The alleged victim informed Officer Andrews that the altercation was the result of "a heroin deal gone bad" (*Id.* at 37:9–12)

60. The alleged victim declined to be a victim in the case, so no charges were filed with regard to the altercation.  (*Id.* at 11:6–9)

61. Gray was placed under arrest, handcuffed, and transported to the Johnstown Police Department for processing.  (*Id.* at 12:15–20)

62. Upon further investigation, Officer Andrews learned that Gray was the registered owner of the firearm, he was not a convicted felon, and Gray possessed a license to carry a concealed firearm in Pennsylvania.  (*Id.* at 11:10–14, 38:11–18)

63. Gray was released pending an investigation, but his firearm and the approximately $500 in cash found on him were not returned to him.  (*Id.* at 39:1–4)

---

[3] On direct examination, Officer Andrews initially stated that Gray punched the alleged victim in the face, but on cross-examination, after reviewing his report, Officer Andrews corrected himself and stated that both the alleged victim and Gray stated that the alleged victim punched Gray in the face. (ECF No. 90 at 37:4–8)  The record is not clear as to what else transpired during the altercation that lead the alleged victim to call 911.

64. Gray was not charged with a crime as result of the incident on May 15, 2018.  (*Id.* at 38:21–25)

### F.  Parking Stall

65. Main Street is in the vicinity of the parallel parking stall where the Suzuki SUV was parked and is a one-way street with parking available on both the right and left sides of the street.  (ECF No. 90 at 48:6–12; Def. Ex. A)

66. There are two traffic lanes on Main Street.  (Def. Exs. A, B)

67. The parking stalls on Main Street are marked using white paint and there is a traffic meter at each parking stall.  (ECF No. 90 at 48:9–12; Def. Ex. A)

68. There is a sidewalk along both sides of Main Street that juts-out approximately one car-length at various intervals into the parallel parking lanes on both sides of the Main Street.  (Def. Exs. A, B)

69. On account of the sidewalk jutting out into Main Street, a vehicle parked in a parking stall could only travel for a short distance—several car lengths—before encountering the sidewalk directly in front of a vehicle.  (Def. Exs. A, B)

### III.  Conclusions of Law

Gray raises three grounds for suppression of the physical evidence seized as a result of the traffic stop on July 10, 2018.  First, he contends that Officer Andrews did not have a reasonable suspicion based upon the confidential informant's tip and his previous interactions with Gray to believe that Gray was involved in criminal activity to justify the traffic stop.  Second, he contends that Officer Andrews did not have a reasonable suspicion

to believe that a traffic violation had occurred because use of a signal was not required to exit the parking stall. Third, Gray contends that, even if officer Andrews had a reasonable suspicion to believe that a traffic violation had occurred, Officer Andrews detained Gray beyond the time necessary to complete the purpose of the traffic stop.

### A.  Reasonable Suspicion for the Traffic Stop as a *Terry* Stop

#### 1.  The Parties' Arguments

The Government argues that the traffic stop of the Suzuki SUV was permissible as a *Terry* stop because Officer Andrews had reasonable suspicion to believe that Gray was involved in criminal activity. (ECF No. 98 at 16–18) The Government argues that Officer Andrews's reasonable suspicion was based on: (1) the confidential informant's tip; (2) the confidential informant's tip being corroborated by Gray arriving at the Amtrak station; and (3) the circumstances of Officer Andrews's prior interaction with Gray. (*Id.*)

Gray contends that none of the grounds cited by the Government are sufficient to support a reasonable suspicion that he was involved in criminal activity. (ECF No. 103 at 9–13) First, he argues that the previous encounter between Officer Andrews and himself does not support a reasonable suspicion because, through that interaction, Officer Andrews learned that Gray was not a convicted felon, had a valid concealed carry permit, and the drugs recovered in the vicinity were a different substance than what he was alleged to have been selling. (*Id.* at 10–11) Second, Gray contends that the confidential informant's tip was insufficiently detailed. (*Id.* at 11–13) Third, Gray argues that the only corroboration of the confidential informant's tip was that he arrived at the Amtrak station which is slight and

not probative. (*Id.*) Gray also argues that him appearing "shaky" does not give rise to reasonable suspicion and that, even if Officer Andrews had reasonable suspicion to stop and pat him down for a firearm, such suspicion dissipated when the pat down revealed no firearm or contraband on his person. (*Id.* at 20–21)

### 2. Legal Standard

Reasonable suspicion requires a "reasonable, articulable suspicion that criminal activity is afoot." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). It requires less than probable cause but more than a mere hunch. *Navarette v. California*, 572 U.S. 393, 397 (2014). Reasonable suspicion is evaluated under the totality of the circumstances. *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012).

Information relayed to the police by an informant can support a *Terry* stop if the communication "possessed sufficient indicia of reliability, when considering the totality of the circumstances" *United States v. Brown*, 448 F.3d 329, 250 (3d Cir. 2006) (quoting *United States v. Nelson*, 284 F.3d 472, 481 (3d Cir. 2002)). When a *Terry*[4] stop is based on a tip provided by an informant, a court must scrutinize the informant's "'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010) (quoting *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008)). A court is to consider several factors in assessing the reliability of an informant's tip: (1)

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

whether the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) whether the informant can be held responsible if the allegations are untrue; (3) whether the information would not be available to the ordinary observer; (4) whether the informant has recently witnessed the criminal activity at issue; and (5) whether the informant's information accurately predicts future activity. *Id.* Although all of these factors are relevant to the analysis, no one factor is dispositive or necessary to render an informant's tip reliable. *Id.*

Courts give greater weight to tips from known informants than anonymous informants. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000); *United States v. Cephas*, 808 F. App'x 122, 124 (3d Cir. 2020). This is because the reputation of a known informant can be assessed, and a known informant can be held responsible if the allegations turn out to be fabricated. *J.L.*, 529 U.S. at 270.

An informant who accurately predicts the future behavior of a person demonstrates a "special familiarity with [that person's] affairs," which implies that the informant has "access to reliable information about that individual's illegal activities." *Alabama v. White*, 496 U.S. 325, 332 (1990). While an informant who is "proved to tell the truth about some things is more likely to tell the truth about other things, 'including the claim that the object of the tip is engaged in criminal activity,'" *Navarette*, 572 U.S. at 398 (quoting *White*, 496 U.S. at 331), the Supreme Court has also cautioned that "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such

knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband," *J.L.*, 529 U.S. at 271.

### 3. Analysis

Officer Andrews testified that:   (1) he knows the identity of the confidential informant and knew the confidential informant's identity at the time of the tip; (2) the confidential informant called Officer Andrews on his cell phone; (3) the confidential informant had previously provided information to Officer Andrews about narcotics; and (4) information previously provided by the confidential informant had been corroborated. (ECF No. 90 at 12:23–14:13)

With regard to the first factor, the tip here was made telephonically, not during a face-to-face interaction.  Thus, Officer Andrews's ability to "assess directly the informant's credibility" was more limited than if the interaction had been in person.  *Johnson*, 592 F.3d at 449.  But this factor is not particularly probative where law enforcement knows the identity of the informant and previous tips provided by the informant had been corroborated.  *See Johnson*, 592 F.3d at 449 (finding that a tip not being made face-to-face was insignificant where the informant gave her name, telephone number, and the address of her home to law enforcement); *see also J.L.*, 529 U.S. at 270 (contrasting an anonymous tip with a tip from a known informant "whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated").

The second factor—whether the informant can be held responsible if the allegations are untrue—strongly supports the veracity and reliability of the tip and informant.  Officer

Andrews knew the identity of the confidential informant and had an ongoing relationship with the confidential informant in which the confidential informant provided information to Officer Andrews. Thus, the confidential informant could be held responsible if the tip ultimately proved false. *See J.L.*, 529 U.S. at 270.

The third factor—whether the information would not be available to the ordinary observer—also supports the veracity and reliability of the tip and the informant's basis of knowledge. An ordinary observer would not have known that Gray would be travelling from Philadelphia to Johnstown by train on a specific day or that he would have drugs in his possession. After receiving the tip, Officer Andrews conducted surveillance and confirmed some aspects of the tip when he observed Gray arrive at the Amtrak station in Johnstown immediately after the train from Philadelphia arrived. But the Supreme Court has stated that while "knowledge about a person's future movements indicates some familiarity with that person's affairs, [] having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." *J.L.*, 529 U.S. at 271. This comment was made by the Court when discussing its prior opinion in *White*, a case that the Court stated was a "close case" but nonetheless found corroboration of an individual's movements sufficient. *J.L.*, 549 U.S. 270–71 (discussing *White*, 496 U.S. at 325).

The Supreme Court's opinion in *Alabama v. White* is instructive here. In *White*, the police received an anonymous tip that a woman was carrying cocaine and the tipster stated that, at a specified time, a woman would:  leave an apartment building alone, carrying a

brown attaché case, get into a car matching a particular description, and drive to a particular motel. *White*, 496 U.S. at 327. The police conducted surveillance of the apartment and observed a woman matching the description leave the apartment building at the specified time, not carrying anything in her hands, get into a car matching the description, and drive toward the motel. The police followed her as she drove toward the motel and pulled her over just short of the motel. *Id.* The Court concluded that it was only after the woman acted in accordance with the tip that there were sufficient indicia of reliability. *Id.* at 332. The Court stated that "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *Id.* The Court concluded "[w]hen significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least enough to justify the stop." *Id.*

Here, as in *White*, predictions about an individual's future itinerary were made and those predictions were verified. Gray arrived in Johnstown on the Amtrak train from Philadelphia on the date the informant predicted. This is less detailed than the tip provided in *White*. However, unlike in *White*, the confidential informant was not anonymous but was known to Officer Andrews, had previously provided information to Officer Andrews, and some of the previously provided information had been verified. Therefore, although *White* was a "close case," the circumstances here are not as close as the circumstances there. The information and predictions made by the confidential informant were not the type of

information known to an ordinary observer, and only a person privy to Gray's itinerary would have been able to predict his arrival at the Amtrak station.

The fourth factor—whether the informant has recently witnessed the criminal activity at issue—is largely inapplicable to the circumstances here.   The confidential informant was providing information about the future, not about an incident that had already occurred.  Cases in which this factor is given weight are those in which the person providing the information observed the incident first hand, versus relaying second or third hand information.  *See Brown*, 448 F.3d at 249–50; *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000).  Where the tip is about future conduct, this factor is of little relevance or applicability.

The fifth factor—whether the informant's information accurately predicts future activity—supports the reliability of the tip.  The tip accurately predicted the future.  The confidential informant stated that: (1) a black male (2) named Anthony Gray (3) was coming to Johnstown (4) via Amtrak (5) from Philadelphia (6) on a specific day.  (ECF No. 90 at 3924–40:7)  Officer Andrews confirmed this information and these predictions by conducting surveillance of the Amtrak station and subsequently following the SUV and making a positive identification that the individual was, in fact, Gray.

After reviewing the factors, with the purpose of evaluating the confidential informant's "veracity, reliability, and basis of knowledge" the Court finds that, considering the totality of the circumstances, the confidential informant's tip, bolstered by Officer Andrews's independent corroboration of some of its predictions of the future, was

sufficiently reliable to provide Officer Andrews with reasonable suspicion that Gray was involved in criminal activity. *Johnson*, 592 F.3d at 449.

Gray's actions after the traffic stop only serve to buttress Officer Andrews's reasonable suspicion. Officer Andrews recognized Gray from a prior incident where a witness stated that Gray had sold him drugs. (ECF No. 90 at 59:13–17) Officer Andrews observed that Gray was "very shaky" and his statement that he was going into a smoke shop did not make sense, as it was clearly closed. (ECF No. 90 at 19:5–10, 20:6–12) *See Nelson*, 284 F.3d at 477 (stating that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" (quoting *Wardlow*, 528 U.S. at 124)).

The pat-down of Gray revealing no contraband did not dissipate Officer Andrew's reasonable suspicion. A person transporting narcotics does not necessarily keep them on his person but may also transport them in a bag or may attempt to hide the narcotics once alerted to an impending encounter with law enforcement. *Cf. United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018) (stating that "reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation). Accordingly, the pat-down did not remove Officer Andrews's reasonable suspicion.

Once Officer Andrews pulled over the SUV: Gray consented to a pat-down (ECF No. 89 at 18:20–23), the driver of the SUV consented to a search of her vehicle (*Id.* at 21:9–23), and Gray consented to a search of his bag. (*Id.* at 21:25–22:14) *See Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 219 (1973).  Gray does not contest that his consent was freely and voluntarily given.

Accordingly, under the totality of the circumstances, Officer Andrews had a reasonable suspicion that Gray was involved in criminal activity to support a *Terry* stop of the SUV and, thereafter, had consent to conduct the search that resulted in Officer Andrews seizing suspected crack cocaine from inside of the chip bag that belonged to Gray.

**B.  Reasonable Suspicion for the Traffic Stop**

Assuming, *arguendo*, that Officer Andrews did not have reasonable suspicion of criminal activity to conduct a *Terry* stop of the SUV, the Court considers whether Officer Andrews had a reasonable suspicion to believe that of a traffic violation had occurred.

**1.  The Parties' Arguments**

Gray argues that evidence obtained as a result of the traffic stop of the Suzuki SUV must be suppressed because Officer Andrews did not have reasonable suspicion to believe that a motor vehicle offense occurred.  (ECF Nos. 70 at 5–6; 93 at 10–17)  According to Gray, Officer Andrews did not have reasonable suspicion that the driver of the SUV had committed a traffic violation because, under unambiguous Pennsylvania law, the driver of the SUV was not required to use a turn signal when entering the stream of traffic from the traffic stall.  (ECF Nos. 93 at 10–17, 103 at 2–7)  Further, Gray argues that, because the statute is unambiguous, Officer Andrews's mistaken belief that a turn signal was required could not be objectively reasonable.  (ECF No. 103 at 8–9)

In response, the Government contends that Officer Andrews had a reasonable suspicion that a violation of 75 Pa. Cons. Stat. § 3334—turning movements and required signals—occurred when the driver of the SUV merged into the stream of traffic on Main Street from the traffic stall without using a turn signal. (ECF No. 98 at 9–13) Further, even if a signal was not technically required, the Government contends that Officer Andrews's belief that a violation of § 3334 had occurred was objectively reasonable and, thus, the traffic stop was lawful.

### 2.  Legal Standard

A traffic stop is a type of *Terry* stop, and requires a law enforcement officer have reasonable suspicion that a traffic violation occurred. *See Green*, 897 F.3d at 178. "Though reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the 'specific, articulable facts' to justify a reasonable suspicion to believe that an individual has violated the traffic laws." *Delfin-Colina*, 464 F.3d at 397 (quoting *United States v. Cortez*, 449 U.S. 411, 416 (1981)). The reviewing court must consider the totality of the circumstances when evaluating the reasonableness of the stop, including the "content of information possessed by police and its degree of reliability," *Navarette*, 572 U.S. at 397 (quoting *White*, 496 U.S. at 330), and "whether the 'rational in[ferences] from those facts reasonably warrant [the] intrusion,'" *Delfin-Colina*, 464 F.3d at 397 (second alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Whether the police officer had a pretextual motivation is irrelevant so long as the officer witnessed "any technical violation of a traffic code." *United States v. Mosely*, 454 F.3d 249, 252 (3d Cir. 2006). A traffic

stop is a seizure of not just the driver but any occupants of the vehicle. *Brendlin v. California*, 551 U.S. 249, 257 (2007).

Searches and seizures based on an officer's mistake of law are valid if the mistake of law is objectively reasonable. *Heien v. North Carolina*, 574 U.S. 54, 60–61, 66 (2014). As the Supreme Court explained, "an officer may 'suddenly confront' a situation in the field as to which the application of a statute is unclear—however clear it may later become." *Id.* at 66. For example, "[a] law prohibiting 'vehicles' in the park either covers Segways or not . . . but an officer will nevertheless have to make a quick decision on the law the first time one whizzes by." *Id.* (citation omitted). In her concurring opinion, Justice Kagan explained that, in order for a mistake of law to be objectively reasonable, the law at issue must be "'so doubtful in construction' that a reasonable judge could agree with the officer's view." *Id.* at 69 (Kagan, J., concurring). Numerous courts have followed Justice Kagan's concurrence and required the statute to be ambiguous for a mistake of law to be objectively reasonable. *See, e.g., United States v. Diaz*, 854 F.3d 197, 204 (2d Cir. 2017); *United States v. Stanbridge*, 813 F.3d 1032, 1037 (7th Cir. 2016); *United States v. Alvarado-Zarza*, 782 F.3d 246, 250 (5th Cir. 2015).

### 3. Analysis

The Court finds that Officer Andrews had reasonable suspicion of a traffic violation to support the traffic stop of the Suzuki SUV. Officer Andrews executed the stop of the Suzuki SUV based on § 3334 of the Pennsylvania Vehicle Code, which provides:

> (a)  General rule.—Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked

position unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section.

(b)  Signals on turning and starting.—At speeds of less than 35 miles per hour, an appropriate signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning. The signal shall be given during not less than the last 300 feet at speeds in excess of 35 miles per hour. The signal shall also be given prior to entry of the vehicle into the traffic stream from a parked position.

75 Pa. Cons. Stat. § 3334.  The vehicle code defines "roadway" in relation to two other terms—"highway" and "trafficway":

**"Highway."**  The entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel.  The term includes a roadway open to the use of the public for vehicular travel on grounds of a college or university or public or private school or public or historical park.

**"Roadway."**  That portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the sidewalk, berm or shoulder even though such sidewalk, berm or shoulder is used by pedalcycles.  In the event a highway includes two or more separate roadways the term "roadway" refers to each roadway separately but not to all such roadways collectively.

**"Trafficway."**  The entire width between property lines or other boundary lines of every way or place of which any part is open to the public for purposes of vehicular travel as a matter of right or custom.

75 Pa. Cons. Stat. § 102.

Gray contends that § 3334(a)'s signal requirement for vehicles "enter[ing] the traffic stream from a parked position" only applies to vehicles "[u]pon a roadway" and that the parking stall in which the Suzuki SUV was parked was not "[u]pon a roadway."  (ECF No. 93 at 12–13)  Therefore, he argues that use of a turn signal was not required.  (*Id.*)  There are thus two questions that need to be answered:  (1) is a parallel parking space "[u]pon a

-23-

roadway; and (2) if so, was this particular parallel parking space "[u]pon a roadway" given the unique characteristics of Main Street.

In trying to resolve these questions, the Government and Gray disagree over the applicability of several state appellate court cases to parallel parking spots in general and the particular facts of this case. First, in *Commonwealth v. Staples*, the Pennsylvania Superior Court, in a non-precedential decision, considered whether a police officer had probable cause to stop the defendant's vehicle after the defendant failed to use a turn signal when turning from a parking lot onto a roadway. No. 1945 EDA 2017, 2019 WL 1530238 (Pa. Super. Ct. Apr. 9, 2019). The court found that the parking lot from which the defendant was turning was a trafficway and the road onto which he was turning was a roadway. *Id.* at *3. The Court concluded that, under the plain meaning of the statute, "the requirement of the use of a turn signal applies only where a car is 'upon a roadway' when starting the turn." *Id.* Thus, because the defendant was on a trafficway when starting the turn, he did not violate § 3334(a). The court also found that *Heien* was inapplicable in this situation because the law at issue was not ambiguous on this issue. *Id.* at *4.

In *United States v. Jones*, another court in this District considered a situation in which the defendant had turned from a gas station parking lot onto a roadway without using a signal. 2:18-cr-218, ECF No. 45 at 4–5 (W.D. Pa. May 30, 2019) (Ambrose, J.). The court followed the rationale in *Staples* and concluded that § 3334(a) did not require the defendant to use a signal when turning from the gas station onto a roadway. *Id.* at 4. As in *Staples*, the court found that the statute was unambiguous so *Heien* did not apply. *Id.*

In *Commonwealth v. Tillery*, the Pennsylvania Superior Court, in a published decision, concluded that § 3334(a) does not require the use of a signal when pulling into a parking spot. 2021 PA Super 53, 2021 WL 1152409, *5–6 (Pa. Super. Ct. Mar. 26, 2021). The court stated that the statute "does not address 'mov[ing] out of the flow of traffic' . . . or require the use of a turn signal to pull into a parking place." *Id.* at *5 (alteration in original).

These cases, however, are of little help to resolving the issue here. The Suzuki SUV was not turning from a parking lot or gas station onto a roadway or exiting the stream of traffic to park, but was entering the stream of traffic from a parallel parking space. Unlike exiting the stream of traffic to park, § 3334(a) unequivocally addresses vehicles entering the stream of traffic from a parked position. These cases inform but do not resolve the question of whether a parallel parking space is upon a roadway—requiring the use of a signal to enter the stream of traffic—or off the roadway—not requiring use of a signal to enter the stream of traffic.

More helpful is *Commonwealth v. Washington*, No. 853 MDA 2018, 2018 WL 6011138 (Pa. Super. Ct. Nov. 16, 2018), another non-precedential opinion of the Pennsylvania Superior Court, where the court found that the defendant "fail[ing] to use a turn signal as he pulled out of a parallel parking space" was sufficient to give an officer probable cause that the defendant had violated § 3334. *Id.* at *3, *3 n.4. In doing so, the court quoted § 3334 and emphasized parts of § 3334(a) which provide that: "no person shall . . . enter the traffic stream from a parked position . . . without giving an appropriate signal in the manner provided in this section." *Id.*

*Washington* would seem to resolve this issue. As in *Washington*, the Suzuki SUV was in a "parallel parking space" and pulled out of the parking space without using a turn signal. *Id.* Although a non-precedential opinion, "cannot be taken as stating Pennsylvania law[,] . . . the Court is nonetheless at liberty to rely upon it as persuasive authority regarding the thoughts and opinions of learned Pennsylvania jurists." *Schwartz v. Abex Corp.*, 106 F. Supp. 3d 626, 649 n.63 (E.D. Pa. 2015).

Gray contends that, contrary to *Washington*, a parallel parking space is necessarily not upon a roadway. In support of his position, Gray highlights the definitions section of the vehicle code which, with regard to the terms "park" and "parking," provides:

> (1)  When permitted, means the temporary storing of a vehicle, whether occupied or not, off the roadway.
> (2)  When prohibited, means the halting of a vehicle, whether occupied or not, except momentarily for the purpose of and while actually engaged in loading or unloading property or passengers.

75 Pa. C.S. § 102. In particular, Gray highlights that Officer Andrews stated that the SUV was legally parked in the parking stall and the vehicle code's definition section provides that parking is only permitted "off the roadway." *Id.* Thus, if the SUV was parked legally in the traffic stall, it must have been parked off the roadway.

Contrary to Gray's interpretation, the motor vehicle code does not categorically prohibit parking upon a roadway. For example, the motor vehicle code allows pedalcycles to be parked "on the roadway . . . at any location where parking is allowed." 75 Pa. Cons. Stat. § 3509(b). Outside of a business or residence district, parking is prohibited on a roadway, but only "when it is practicable" to park off the roadway. *Id.* § 3551(a). And, of

course, the court in *Washington* necessarily must have concluded that the parallel parking spot at issue there was upon a roadway.

It is also worth noting that § 3334(a) introduces the term "traffic stream" as a concept that is distinct from roadway, without defining the term. Thus, § 3334 contemplates vehicles legally parking upon a roadway but in a location that is not in the traffic stream. This understanding of roadway is consistent with *Washington*: vehicles parked in parallel parking spaces adjacent to the stream of traffic are considered to be upon the roadway when parked.

Accordingly, the Court finds the Pennsylvania Superior Court's decision in *Washington* persuasive and consistent with § 3334(a) and the surrounding statutory scheme. Thus, with regard to the first question, a vehicle in a parallel parking space is "[u]pon a roadway" and required to use a signal when "enter[ing] the traffic stream from a parked position," § 3334(a).[5]

But, even if a signal were required for other parallel parking spaces, that does not necessarily mean that this particular parallel parking space is upon a roadway, given the specific features of the parking stall at issue here. In particular, the parking stall here is a marked and metered parking space and the sidewalk juts out at regular intervals in front of and behind the parking stalls on Main Street which would prevent vehicular travel

---

[5] Even if the Court and the Pennsylvania Superior Court's decision in *Washington* are incorrect in this conclusion, the statute is at the very least ambiguous and "a reasonable judge could agree with the [Officer Andrews's] view" so it would be an objectively reasonable mistake of law. *Heien,* 574 U.S. at 70 (Kagan, J., concurring).

through the parking stalls even if all the parking stalls were empty.[6]  (Def. Ex. A)  In other words, the argument is that the area where the Suzuki SUV was parked was not "improved, designed or ordinarily used for vehicular travel" and is instead specifically designed to prevent vehicular travel.

At best for Gray, the statute is ambiguous about whether the parallel parking stall at issue here is upon a roadway.  Pennsylvania's appellate courts have not previously resolved the ambiguity.  *See Heien*, 574 U.S. at 68 (noting that the statutory provision in question had not previously been construed by the state's appellate courts).  A roadway is "that portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the sidewalk, berm or shoulder."  75 Pa. Cons. Stat. § 102.  In construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa. Cons. Stat. § 1903.  Because § 3334(a) uses the disjunctive, to be part of a roadway a parking stall must only be improved for vehicular travel, designed for vehicular travel, *or* ordinarily used for vehicular travel. Parking spaces are not included in the list of parts of a highway that are excluded from being part of a roadway.  *Id.* § 3334(a) (stating that a roadway does not include "the sidewalk, berm or shoulder").  With the exception of paint marking the stalls and the sidewalk jutting into Main Street, the parking stalls appear identical to the rest of Main Street.  Thus, the area of the highway where the parking stalls are located has in some ways

---

[6] A vehicle could only travel several car lengths through the marked traffic stalls before encountering the sidewalk directly in front of the vehicle requiring the vehicle to merge into the traffic stream to continue traveling in either direction.

been improved for vehicular travel (e.g. paved) and, depending on how broadly "vehicular travel" is construed, the parking stalls are also designed and used for vehicular travel, albeit limited to several car lengths.

Despite the specific features of the parallel parking stall here, the Court nonetheless concludes that the parallel parking stall was upon a roadway and § 3334's signal requirement applied to the Suzuki SUV when entering the stream of traffic. There is nothing in § 3334 or elsewhere in the vehicle code that would suggest that a parking meter or a parking space being marked with lines is of any significance in determining whether a parking space is upon a roadway. Similarly, the extensions of the sidewalk in front of and behind the parallel parking stalls have to some degree been improved and designed for permitting the parking space to be used for vehicular travel.

The Court further holds that it was objectively reasonable for Officer Andrews to believe that § 3334 required that the Suzuki SUV use a signal when entering into the stream of traffic from the traffic stall and there was reasonable suspicion justifying the traffic stop. The Court notes that applying § 3334 to the facts and circumstances that Officer Andrews faced in this case requires not just references to multiple sections of the vehicle code, many of which are not models of clarity, but also applying the vehicle code to unique factual circumstances encountered by the parallel parking spaces on this road. This is the kind of situation that the Supreme Court in *Heien* considered: an officer suddenly confronting a situation in the field where the application of the statute is unclear and the officer has to make a quick decision on the law. *See Heien*, 574 U.S. 66.

Therefore, because Officer Andrews had reasonable suspicion that the Suzuki SUV violated § 3334(a), the stop of the Suzuki SUV was reasonable under the Fourth Amendment.

### C.  The Extension of the Traffic Stop

#### 1.  The Parties' Arguments

Assuming, *arguendo*, that the only valid basis for stopping the Suzuki SUV was the traffic violation, Gray contends that the traffic stop was longer than necessary to resolve the alleged motor vehicle violation and that the extension of the stop was unsupported by reasonable suspicion to believe a non-motor-vehicle offense occurred.  (ECF No. 93 at 17–21.)  According to Gray, the traffic stop was extended beyond its traffic-based purpose because Officer Andrews did not take any steps to complete the purpose of the stop and never issued a citation for the traffic violation.  (ECF No. 93 at 19–20)  Gray contends that, instead of taking steps toward issuing a citation, Officer Andrews focused on him and ordered him to enter and exit the vehicle, patted him down, questioned him, handcuffed him, and informed him he was being detained.  (ECF No. 93 at 19–21)  Then, when Officer Andrews turned his attention to the driver, it was not to issue a citation but to ask for consent to search the vehicle.  (*Id.*)

In response, the Government contends that any extension of the traffic stop was justified because Officer Andrews had a reasonable suspicion that Gray was involved in criminal activity and because the driver of the SUV consented to the extension of the traffic stop.  (ECF No. 98 at 20–22)   The Government contends that Officer Andrews had a

reasonable suspicion to believe that Gray was engaged in criminal activity prior to the traffic stop and that Gray's behavior during the traffic stop increased Officer Andrews's suspicion. (*Id.* at 20–21) Particularly, the Government argues that the informant's tip and the corroboration of that tip by Gray arriving at the Amtrak station was sufficient to support a reasonable suspicion. (*Id.* at 15–18, 20) Then, Gray's departure from the SUV and reluctance to return to it, his nonsensical explanation why he wanted to patronize a closed business, and his nervous demeanor magnified Officer Andrews's reasonable suspicion. (*Id.* at 20–21) Further, the Government argues that the pat-down of Gray not revealing any drugs or other contraband does not nullify Officer Andrews's reasonable suspicion because the absence of such items on his person did not mean that they were not in the vehicle. (*Id.* at 21–22)

### 2. Legal Standard

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *Green*, 897 F.3d at 179 (citing *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015)).

The analysis of whether a traffic stop was unreasonably extended involves three separate inquiries. First, the Court must determine whether the traffic stop was extended to facilitate the investigation of non-traffic-based crimes. *Id.* Second, if an extension

occurred, the Court must identify the *Rodriguez* moment—the moment at which the stop was "measurably extend[ed]" longer than necessary to effectuate its traffic-based purpose. *Id.* (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355). Finally, the Court determines whether the facts known to the police officer at the *Rodriguez* moment were sufficient to establish reasonable suspicion that criminal activity was afoot, justifying a prolonged stop. *Id.*

The United States Supreme Court has explained that a police officer executing a lawful traffic stop may conduct "ordinary inquiries incident to such a stop." *Caballes*, 543 U.S. at 408. For example, the officer may check the driver's license, determine whether there are outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Rodriguez*, 575 U.S. at 355. Such inquiries are permissible because they serve the purpose of the traffic stop: ensuring roadway safety. *Id.*; *Clark*, 902 F.3d at 410. However, "measures aimed at detecting criminal activity more generally," such as a dog sniff, cannot be performed in a way that measurably extends the stop unless the officer has reasonable suspicion. *Green*, 897 F.3d at 179-80.

### 3. Analysis

Under *Rodriguez* and *Green*, the Court must first determine whether this traffic stop was extended beyond the time necessary to address the traffic violations that warranted the stop. *See Rodriguez*, 575 U.S. at 354; *Green*, 897 F.3d at 179. Gray argues that the *Rodriguez* moment is when Officer Andrews immediately took steps to search Gray's person. (ECF No. 93 at 19) Gray contends that Officer Andrews did not have a reasonable suspicion when

Officer Andrews diverted from the purpose of the traffic stop by patting him down because Officer Andrews had not observed any contraband and the informant's tip was merely that Gray had "work" in his possession was insufficient.  (ECF No. 93 at 19)  Gray also suggests several other potential *Rodriguez* moments:  (1) Officer Andrews asking for permission to search the vehicle after the pat-down revealed no firearm or contraband; (2) Officer Andrews questioning Gray about his conduct; (3) Officer Andrews asking to search Gray's bag; and (4) the traffic stop itself.  (*Id.* at 19–21)

The Court disagrees with Gray's contention that the pat-down itself was the *Rodriguez* moment.  An officer may conduct a patdown of a passenger during a routine traffic stop when there is reasonable suspicion that the individual may be armed and dangerous.  *Arizona v. Johnson*, 555 U.S. 323, 332 (2009); *see Clark*, 902 F.3d at 410 (noting that the Court in *Rodriguez* found that "[t]asks tied to officer safety are also part of the stop's mission when done out of an interest to protect officers").  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. Officer Andrews testified as to specific and articulable facts showing that he had a reasonable suspicion that Gray was armed and dangerous: Gray jumped out of the vehicle and walked toward a clearly closed smoked shop, Officer Andrews had to order Gray back to the car several times before he complied, Gray appeared shaky, and his explanation for getting out of the car did not make sense. *See United States v. Calloway*, 571 F. App'x 131, 136–37 (3d Cir. 2014).  (ECF No. 90 at 19:5–20:12)  Officer

Andrews also knew from his prior interaction with Gray that he carried a concealed firearm. (*Id.* at 20:13–23) Further, Officer Andrews did not just pat-down Gray but asked him for consent to pat him down and Gray consented to the pat-down. (*Id.* at 20:18–24)

The Court finds that the earliest possible *Rodriguez* moment is Officer Andrews asking the driver of the SUV to consent to a search of the vehicle. This request did not relate to the traffic violation but was "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 575 U.S. at 355 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)); *see Clark*, 902 F.3d at 410 (noting that there is no de minimis exception to *Rodriguez* and the brevity of the questioning is not relevant to the analysis). The Third Circuit has not resolved how rigidly to apply *Rodriguez*. *See Green*, 897 F.3d at 180–81 (discussing approaches by other circuits as to how rigidly or leniently to interpret extending the traffic stop).

Having identified the request to search the vehicle as the earliest possible *Rodriguez* moment, the next question is whether the facts known to Officer Andrews at this moment were sufficient to establish reasonable suspicion that criminal activity was afoot and to justify prolonging the stop. *See Green*, 897 F.3d at 179. Even if the confidential informant's tip was insufficiently corroborated to rise to the level of reasonable suspicion, when combined with Gray's demeanor and actions during the traffic stop and Officer Andrews's

previous interactions with Gray, these combined factors were sufficient to rise to the level of reasonable suspicion.

But even if there was still no reasonable suspicion, Officer Andrews asked for and obtained consent from the driver to search the SUV. The time it took to ask the driver of the SUV to search the vehicle could be construed as an extension of the traffic stop. Thus, the traffic stop was extended merely the length of time it took for Officer Andrews to ask for consent, to subsequently ask Gray for consent to search his bag, and to ask Gray what was in the bag. Requiring reasonable suspicion to ask for consent to search would be an extremely strict reading of *Rodriguez* and there is no indication that the Supreme Court intended to bury such a sweeping holding within its opinion given that consent is a long-standing exception to the requirement that an officer have reasonable suspicion. *See United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018) (noting that, once reasonable suspicion has been dispelled, a brief extension violates the Fourth Amendment unless there is consent). Accordingly, the Court finds that Officer Andrews asking for consent to search the SUV did not unlawfully extend the traffic stop. *See United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (stating that "to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess reasonable suspicion or receive the driver's consent" (citation and internal quotation marks omitted)); *United States v. Tuton*, 893 F.3d 562, 567–68 (8th Cir. 2018) (stating that the Fourth Amendment does not prohibit an officer from asking for consent to search and that an individual who

consents to a search is by necessity also consenting to an extension of the traffic stop while the search is conducted).

After the driver consented, the traffic stop was lawfully extended for Officer Andrews to search the SUV.  Officer Andrews discovered Gray's bag, asked Gray for consent to search the bag, and Gray consented to the search of his bag.  Thus, the traffic stop was similarly lawfully extended to search Gray's bag.  Accordingly, any extension of the traffic stop beyond its traffic-based purpose was supported by both reasonable suspicion and consent.

IV.     **Conclusion**

For the foregoing reasons, the Court **DENIES** Defendant Anthony E. Gray's Motion to Suppress Evidence.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 3:18-23 |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| ANTHONY E. GRAY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this ___6th___ day of May, 2021, upon consideration of Defendant

Anthony E. Gray's Motion to Suppress Evidence (ECF No. 70), and for the reasons set forth

in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendant's

Motion is **DENIED**.

BY THE COURT:

_____

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE